**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| ELYSIAN FIELDS TECHNOLOGIES LLC<br><br>Plaintiff,<br><br>v.<br><br>RENESAS ELECTRONICS AMERICA INC.<br><br>Defendant. | **Civil Action No. 2:26-cv-962**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Elysian Fields Technologies LLC ("EFT" or "Plaintiff"), for its Complaint against Defendant Renesas Electronics America Inc., (referred to herein as "Renesas" or "Defendant"), alleges the following:

**NATURE OF THE ACTION**

1. This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*.

**THE PARTIES**

2. Plaintiff EFT is a limited liability company organized under the laws of the State of Texas with a place of business at 1400 Preston Road, Suite 461, Plano, Texas 75093.

3. Upon information and belief, Renesas is a corporation organized under the laws of the State of California with a place of business at 2701 Dallas Parkway, Plano, Texas 75093. Upon information and belief, Renesas sells, offers to sell, and/or uses products and services throughout the United States, including in this judicial district, and introduces infringing

products and services into the stream of commerce knowing that they would be sold and/or used in this judicial district and elsewhere in the United States.

## JURISDICTION AND VENUE

4. This is an action for patent infringement arising under the Patent Laws of the United States, Title 35 of the United States Code.

5. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

6. Venue is proper in this judicial district under 28 U.S.C. § 1400(b).

7. On information and belief, Defendant is subject to this Court's general and specific personal jurisdiction because Defendant has sufficient minimum contacts within the State of Texas and this District, pursuant to due process and/or the Texas Long Arm Statute because Defendant purposefully availed itself of the privileges of conducting business in the State of Texas and in this District, because Defendant regularly conducts and solicits business within the State of Texas and within this District, and because Plaintiff's causes of action arise directly from Defendant's business contacts and other activities in the State of Texas and this District.

## U.S. PATENT NO. 6,331,953

8. On December 18, 2001, U.S. Patent No. 6,331,953 (the "'953 patent") was duly and legally issued by the United States Patent and Trademark Office under the title "Intelligent Ramped Gate and Ramped Drain Erasure for Non-Volatile Memory Cells." A true and correct copy of the '953 patent is attached as Exhibit A.

9. Plaintiff is the assignee and owner of the right, title, and interest in and to the '953 patent, including the right to assert all causes of action arising under said patents and the right to any remedies for infringement of them, including all past infringement.

10. The claims of the ’953 patent are directed to techniques for operating non-volatile semiconductor memory cells by applying controlled coarse and fine erase voltage sequences to a gate/region structure of the cell to remove charge from a charge-trapping layer. (*See* Ex. A at 1:11-18; 1:66-2:35.

11. In prior art methods, the memory cell is programmed by hot electron injection, and the injected charges are stored in the oxide-nitride-oxide (ONO) layer of the device. Both programming and reading the device is done in a forward direction which requires a wider charge trapping region to achieve a sufficiently large difference in threshold voltages between programming and reading. This, however, makes it much more difficult to erase the device. (Ex. A at 1:38-50.)

12. Attempts to improve erasure were made. In these prior art devices, a cell is erased by applying a constant negative voltage to the gate over a plurality of cycles. However, in such devices, the number of cycles and time to erase the memory cell could become very large, degrading the memory cell if the number of cycles becomes too large. (Ex. A at 1:51-60.)

13. In contrast, the techniques disclosed in the ’953 patent improve the efficiency of memory erasure by employing a two-stage erasure process that combines coarse and fine erase voltage sequences. During the coarse erase sequence, progressively increasing drain voltages are applied to remove trapped charge from the memory cell. The cell’s read current is monitored and compared against a predetermined erase-verification value to determine when to transition to the fine erase sequence. During the fine erase sequence, progressively increasing gate voltages provide more precise control over the removal of the remaining trapped charge. By combining the faster, coarser removal of charge with a more controlled final erasure, the disclosed techniques reduce the number of erase cycles needed and lessen the overall time required to

erase the memory cell, while reducing the likelihood of cell degradation associated with repeated erase cycles. (Ex. A at 1:66-2:35; 13:24-14:55.)

**U.S. PATENT NO. 6,831,346**

14. On December 14, 2004, U.S. Patent No. 6,831,346 (the "'346 patent") was duly and legally issued by the United States Patent and Trademark Office under the title "Buried Layer Substrate Isolation in Integrated Circuits." A true and correct copy of the '346 patent is attached as Exhibit B.

15. Plaintiff is the assignee and owner of the right, title, and interest in and to the '346 patent, including the right to assert all causes of action arising under said patents and the right to any remedies for infringement of them, including all past infringement.

16. The claims of the '346 patent are directed to specific integrated-circuit substrate-isolation structures for reducing substrate-coupled noise from transistors formed in wells having the same conductivity type as the semiconductor substrate. The claimed structures use a buried layer of opposite conductivity type beneath the transistor well, including embodiments where the buried layer has a central portion underlying the transistor and a separate annular portion laterally surrounding the central portion, together with annular doped regions, contacts, and metallization arrangements that control how the well and buried-layer contact structures are biased. (*See* Ex. B at 1:66–2:65, 4:44–65, 7:5–15, 7:25–55, 9:17–31, 10:13–25, 11:1–12.

17. Substrate-coupled noise problems arise in mixed-signal integrated circuits, where noise-sensitive analog circuitry shares a semiconductor substrate with noise-generating digital circuitry. High-power switching transistors, such as output transistors, can generate noise that couples through the common semiconductor substrate to analog circuit portions. Conventional CMOS/BiCMOS structures used buried layers beneath wells, and those buried layers are typically heavily doped layers having the same conductivity type as the overlying well.

Although those buried layers could reduce well resistance and facilitate topside well connections, in circuits formed on p-type substrates, p+ buried layers beneath p-type wells created direct resistive coupling between p-type wells for n-channel transistors and the p-type substrate. Because of this direct resistive coupling path, an improved substrate-isolation structure is needed to reduce noise coupling from such transistors. (Ex. B at 1:13-63.)

18. To address the problems identified in the prior art, the ’346 patent teaches integrated-circuit substrate-isolation structures that reduce substrate-coupled noise from noise-prone transistors, particularly output transistors, by using a buried layer having a conductivity type opposite that of the overlying well where the well has the same conductivity type as the substrate. (Ex. B at 1:66–2:4.) In disclosed embodiments, the structure may also include a doped annular region of the same conductivity type as the buried layer that laterally surrounds the transistor and contacts the buried layer, thereby providing junction isolation around the transistor. (*Id.* at 2:4–17, 7:47–55.) This arrangement reduces coupling of noise from the transistor into the semiconductor substrate and, as a result, reduces coupling of that noise to other circuit portions, including noise-sensitive analog circuitry on the same die. (*Id.* at 2:66–3:5, 4:44–61, 7:5–62.) The ’346 patent further teaches metallization and segmented buried-layer configurations that account for device-biasing concerns: the annular region may be biased, left floating, or connected to the same supply polarity as the well, and the buried layer may include a central portion underlying the transistor and a separate annular portion laterally surrounding it so that the central buried-layer portion remains electrically floating. (*Id.* at 2:18–44, 8:54–9:14.) In another embodiment, depletion-region “pinch-off” between buried-layer portions may substantially reduce coupling of noise from the n-channel transistor to the p-type substrate, while

the patent states that the disclosed buried-layer embodiments can be implemented by modifying an existing buried-layer mask without requiring additional masks. (*Id.* at 3:5–10, 9:44–62.)

19. The substrate-isolation structures disclosed in the ’346 patent improve the operation of integrated circuits by reducing the transmission of switching noise from noise-generating transistors through the common semiconductor substrate to other circuit components. By providing improved electrical isolation between transistor wells and the substrate, the disclosed structures reduce interference with noise-sensitive analog circuitry and improve the performance of mixed-signal integrated circuits. These improvements are achieved through specific semiconductor structures that also accommodate device-biasing requirements and can be implemented without requiring additional fabrication masks. (Ex. B at 3:1–10, 4:44–61, 7:25–55, 9:44–62.)

**U.S. PATENT NO. 8,564,605**

20. On October 22, 2013, U.S. Patent No. 8,564,605 (the "’605 patent") was duly and legally issued by the United States Patent and Trademark Office under the title "Display Interface Buffer." A true and correct copy of the ’605 patent is attached as Exhibit D.

21. Plaintiff is the assignee and owner of the right, title, and interest in and to the ’605 patent, including the right to assert all causes of action arising under said patents and the right to any remedies for infringement of them, including all past infringement.

22. The claims of the ’605 patent are directed to display-interface buffering structures and methods that use general-purpose memory, transaction descriptors, a memory-access controller, and multiple display drivers to provide display data to selected portions of a display panel. In disclosed embodiments, display data may be stored in a general-purpose memory rather than in a dedicated display memory, and transaction descriptors identify where the display data is stored and which display driver should receive it for presentation on the panel. (Ex. D at

1:50–57, 2:12–24, 3:27–65, 4:1–23.) The ’605 patent further teaches display drivers having FIFO buffers, address decoders, and drive-voltage selectors that receive data from the memory-access controller and drive corresponding display pins, such as common or segment pins, according to the display data. (*Id.* at 1:58–2:11, 4:24–65, 5:1–49.)

23. Conventional display devices at the time typically included controllers and dedicated display memory for storing data to be presented on a display panel. In those conventional systems, the dedicated display memory stored data according to a fixed mapping between stored data and the portion of the display panel where the data was to be displayed, and the memory provided common or segment signals to the panel when prompted by a controller. These dedicated display memories were commonly used to present data on display panels, but this approach was problematic in configurable display systems because the fixed mapping between stored data and panel location increased memory size and cost. (Ex. D at 1:15-29.)

24. To address this issue, the ’605 patent teaches a display-interface architecture that improves configurability and resource usage by storing display data in general-purpose memory and using transaction descriptors to define the relationship between the memory locations holding display data and the display drivers that will present that data on the panel. (Ex. D at 3:29–4:29.) This allows display data to be located anywhere in general-purpose memory, including non-contiguous memory locations interleaved with other general data, while still accurately providing the data to the appropriate display drivers. (*Id.* at 3:34-39, 4:13–25.) Locating display data in general-purpose memory reduces overall system cost and size while increasing system configurability and versatility . (*Id.*) The ’605 patent also discloses display drivers with FIFO buffers, address decoding, and drive-voltage selectors that permit display data to be loaded, latched, and used to select reference voltages for driving corresponding display

pins. (*Id.* at 4:59–5:49). Additionally, the disclosed display drivers can support both display-driving and general-purpose I/O modes, allowing the same display-driver architecture to output either display data or general-purpose I/O data through an input-output pin. (*Id.* at 7:36–8:20.)

25. The display-interface buffering techniques disclosed in the ’605 patent improve the operation of display systems by eliminating the need for dedicated display memory having a fixed mapping between stored display data and display-panel locations. By using transaction descriptors to associate display data stored at non-contiguous locations in general-purpose memory with specific display drivers, the disclosed architecture enables more flexible allocation and efficient utilization of memory resources while ensuring that the correct data is delivered to the appropriate portions of the display panel. The disclosed buffering and addressing arrangements further permit display data to be loaded into multiple display drivers and subsequently latched for presentation, allowing more efficient utilization of shared address and data buses. These technological improvements reduce system memory requirements, cost, and size while increasing the configurability and versatility of display systems. (Ex. D at 3:34–4:29, 5:1–49, 5:50–6:5, 7:5–35.)

**COUNT I – INFRINGEMENT OF U.S. PATENT NO. 6,331,953**

26. The allegations set forth in the foregoing paragraphs 1 through 25 are incorporated into this First Claim for Relief.

27. The inventions of the ’953 patent resolve technical problems related to inefficient and potentially degrading erase operations in charge-trapping non-volatile memory cells, including erase slowdown caused by electron trapping in oxide layers or charge spillover in the nitride layer. For example, the inventions improve memory-cell erasure by employing coordinated coarse and fine erase voltage sequences to remove charge from the charge-trapping region. The disclosed techniques reduce erase time and, in certain embodiments, reduce the

number of erase cycles required to complete erasure, thereby reducing cell degradation associated with repeated erase operations.

28. The claims of the ’953 patent are directed to specific technological improvements in the operation of non-volatile semiconductor memory cells, rather than an abstract idea implemented using conventional computer components. In particular, the claims address problems arising in charge-trapping EEPROM and flash EEPROM devices, including excessive erase cycles, erase slowdown, and cell degradation associated with prior erase techniques. The claimed coarse and fine erase sequences provide a specific technological solution to these problems by controlling the application of erase voltages to remove trapped charge more efficiently.

29. The claims of the ’953 patent do not merely recite the routine or conventional use of erase pulses in non-volatile memory cells. Instead, the claims require coordinated coarse and fine erase voltage sequences applied across defined gate and cell-region structures to remove charge from a charge-trapping region. Certain claims further specify the use of ramped voltages, while others require monitoring the memory cell's read current and comparing it against an erase-verification value to determine when to transition from coarse to fine erasure. These techniques provide specific mechanisms for controlling the erasure process to improve erasure efficiency and reduce the potential for cell degradation.

30. The technology claimed in the ’953 patent does not preempt all methods of erasing non-volatile memory cells, the use of all voltage pulses or erase sequences in EEPROM or flash EEPROM devices, or other known memory-erasure techniques. Instead, the claims are directed to particular combinations of coarse and fine erase voltage sequences applied to defined

gate and cell-region structures to remove charge from a charge-trapping region, with certain claims further specifying particular voltage sequences or erase-verification operations.

31. Accordingly, the claims of the '953 patent recite specific technological features and combinations of elements directed to improving the operation of non-volatile memory cells, rather than merely claiming a desired result. These claimed features, individually and in their ordered combinations, provide concrete mechanisms for implementing coarse and fine erase operations and support the conclusion that the claims are directed to patent-eligible subject matter and recite significantly more than any alleged abstract idea..

32. Upon information and belief, Defendant has directly infringed at least claim 23 of the '953 patent by making, using, selling, importing and/or providing and causing to be used devices incorporating embedded nonvolatile flash memory, including, but not limited to, devices bearing R5F6-series part numbers (the "R5F6 Devices"), and other Renesas microcontrollers and semiconductor products incorporating the same or substantially similar embedded nonvolatile flash memory technology, including associated flash memory macros, circuitry, and programming and erase functionality (collectively, the "'953 Accused Instrumentalities").

33. Exemplary infringement analysis showing infringement of claim 23 of the '953 patent is set forth in Exhibit A-1. This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by Renesas with respect to the '953 patent. EFT reserves all rights to amend, supplement and modify this preliminary infringement analysis. Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the '953 patent.

34. On information and belief, these ’953 Accused Instrumentalities were sold marketed, provided to, and/or used by or for Defendant’s partners, clients, customers and end users across the country and in this District.

35. Defendant was made aware of the ’953 patent and its infringement thereof at least as early as August 7, 2018 when it received correspondence from the prior owner of the ’953 patent stating that Defendant had been made aware of the ’953 patent and presented with claim charts concerning Defendant’s infringement. At minimum, the correspondence provided Defendant with notice of the ’953 patent and that Defendant’s products infringed.

36. Upon information and belief, since at least the time Defendant received notice, Defendant has induced others to infringe at least claim 23 of the ’953 patent under 35 U.S.C. § 271(b) by, among other things, and with specific intent or willful blindness, actively aiding and abetting others to infringe, including but not limited to Defendant’s partners, clients, customers, and end users, whose use of the ’953 Accused Instrumentalities constitutes direct infringement of at least claim 23 of the ’953 patent.

37. In particular, Defendant’s actions that aided and abetted others such as its partners, customers, clients, and end users to infringe include advertising and distributing the ’953 Accused Instrumentalities and providing instruction materials, training, and services regarding the ’953 Accused Instrumentalities. On information and belief, Defendant engaged in such actions with specific intent to cause infringement or with willful blindness to the resulting infringement because Defendant had actual knowledge of the ’953 patent and knowledge that its acts were inducing infringement of the ’953 patent since at least the date Defendant received notice that such activities infringed the ’953 patent.

38. Upon information and belief, Defendant is liable as a contributory infringer of the ’953 patent under 35 U.S.C. § 271(c) by offering to sell, selling and importing into the United States Renesas products incorporating embedded nonvolatile flash memory as described above to be especially made or adapted for use in an infringement of the ’953 patent. The ’953 Accused Instrumentalities are a material component for use in practicing the ’953 patent and are specifically made and are not a staple article of commerce suitable for substantial non-infringing use.

39. Since August 7, 2018, Defendant’s infringement has been willful.

40. The ’953 patent expired on November 10, 2020. Plaintiff therefore asserts liability only for the period beginning October 23, 2020 and ending at the date of expiration. Liability exists for this period because Defendant was made aware of the ’953 patent and that its products infringed.

41. EFT has been harmed by the Defendant’s infringing activities.

**COUNT II – INFRINGEMENT OF U.S. PATENT NO. 6,831,346**

42. The allegations set forth in the foregoing paragraphs 1 through 41 are incorporated into this Second Claim for Relief.

43. The inventions of the ’346 patent resolve technical problems related to substrate-coupled noise in integrated circuits, particularly noise generated by switching transistors and transmitted through a shared semiconductor substrate to noise-sensitive analog circuitry. For example, the inventions improve the operation of integrated circuits by employing an oppositely doped buried layer beneath a transistor well having the same conductivity type as the semiconductor substrate, with the buried layer comprising a central portion underlying the transistor and a separate annular portion laterally surrounding the central portion. These structures reduce electrical coupling between noise-generating transistors and the substrate,

thereby reducing interference with other circuit components and improving the performance of mixed-signal integrated circuits.

44. The claims of the ’346 patent are directed to specific technological improvements in integrated-circuit substrate isolation, rather than an abstract idea implemented using conventional components. In particular, the claims address problems arising in semiconductor devices containing noise-generating transistors and noise-sensitive circuitry, including the transmission of switching noise through direct resistive coupling between transistor wells and a shared semiconductor substrate. The claimed buried-layer structures provide a specific technological solution to these problems by establishing improved electrical isolation between the transistor wells and the substrate, thereby reducing the transmission of substrate-coupled noise.

45. The claims of the ’346 patent do not merely recite the routine or conventional use of buried layers in integrated circuits. Instead, the claims require a buried layer having a conductivity type opposite that of an overlying transistor well, where the well and semiconductor substrate have the same conductivity type, and further require the buried layer to include a central portion underlying the transistor and a separate annular portion laterally surrounding the central portion. Certain claims further specify doped annular regions that contact the surrounding buried-layer portion, contact diffusions within the well, metallization arrangements for controlling electrical connections to the well and annular regions, and depletion regions that increase noise isolation. These specific semiconductor structures and configurations provide mechanisms for reducing substrate-coupled noise while accommodating transistor-biasing requirements and improving integrated-circuit performance.

46. The technology claimed in the ’346 patent does not preempt all methods of electrically isolating transistors in integrated circuits, the use of all buried layers or substrate-isolation structures, or other known techniques for reducing substrate-coupled noise. Instead, the claims are directed to particular combinations of semiconductor structures, including an oppositely doped buried layer beneath a transistor well having the same conductivity type as the substrate, with the buried layer comprising a central portion underlying the transistor and a separate annular portion laterally surrounding it. Certain claims further specify particular annular doped regions, contact diffusions, metallization arrangements, or depletion-region configurations that provide additional control over substrate isolation and device operation.

47. Accordingly, the claims of the ’346 patent recite specific technological features and combinations of elements directed to improving the electrical isolation and operation of integrated circuits, rather than merely claiming a desired result. These claimed features, individually and in their ordered combinations, provide concrete semiconductor structures for reducing substrate-coupled noise and support the conclusion that the claims are directed to patent-eligible subject matter and recite significantly more than any alleged abstract idea.

48. Upon information and belief, Defendant has and continues to directly infringe at least claim 1 of the ’346 patent by making, using, selling, importing and/or providing and causing to be used semiconductor devices, including its RH850 family of 32-bit automotive microcontrollers (collectively, the "’346 Accused Instrumentalities"). The ’346 Accused Instrumentalities include, without limitation, devices in Renesas’ RH850/F1x series, including the RH850/F1L product line. These ’346 Accused Instrumentalities incorporate embedded non-volatile flash memory for storing program instructions and other information used in the operation of the microcontrollers. The embedded flash memory is electrically programmable

and erasable, allowing stored information to be updated or replaced without physically removing the memory from the device. The ’346 Accused Instrumentalities include circuitry for controlling and performing operations involving the embedded flash memory, including programming and erasure operations.

49. Exemplary infringement analysis showing infringement of claim 1 of the ’346 patent is set forth in Exhibit B-1 This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by Renesas with respect to the ’346 patent. EFT reserves all rights to amend, supplement and modify this preliminary infringement analysis. Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the ’346 patent.

50. On information and belief, these ’346 Accused Instrumentalities were sold, marketed, provided to, and/or used by or for Defendant’s partners, clients, customers and end users across the country and in this District.

51. Defendant was made aware of the ’346 patent and its infringement thereof at least as early as August 7, 2018 when it received correspondence from the prior owner of the ’346 patent stating that Defendant had been made aware of the ’346 patent and presented with claim charts concerning Defendant’s infringement. At minimum, the correspondence provided Defendant with notice of the ’346 patent and that Defendant’s products infringed.

52. Upon information and belief, since at least the time Defendant received notice, Defendant has induced and continues to induce others to infringe at least claim 1 of the ’346 patent under 35 U.S.C. § 271(b) by, among other things, and with specific intent or willful blindness, actively aiding and abetting others to infringe, including but not limited to

Defendant's partners, clients, customers, and end users, whose use of the '346 Accused Instrumentalities constitutes direct infringement of at least one claim of the '346 patent.

53. In particular, Defendant's actions that aid and abet others such as its partners, customers, clients, and end users to infringe include advertising and distributing the '346 Accused Instrumentalities and providing instruction materials, training, and services regarding the '346 Accused Instrumentalities. On information and belief, Defendant has engaged in such actions with specific intent to cause infringement or with willful blindness to the resulting infringement because Defendant has had actual knowledge of the '346 patent and knowledge that its acts were inducing infringement of the '346 patent since at least the date Defendant received notice that such activities infringed the '346 patent.

54. Upon information and belief, Defendant is liable as a contributory infringer of the '346 patent under 35 U.S.C. § 271(c) by offering to sell, selling and importing into the United States Renesas products incorporating SRAM manufactured at 40 nm and smaller technology nodes to be especially made or adapted for use in an infringement of the '346 patent. The '346 Accused Instrumentalities are a material component for use in practicing the '346 patent and are specifically made and are not a staple article of commerce suitable for substantial non-infringing use.

55. Since August 8, 2017, Defendant's infringement has been willful.

56. The '346 patent expired on December 10, 2021. Plaintiff therefore asserts liability only for the period beginning October 23, 2020 and ending at the date of expiration. Liability exists for this period because Defendant was made aware of the '346 patent and that its products infringed.

57. EFT has been harmed by the Defendant's infringing activities.

**COUNT III – INFRINGEMENT OF U.S. PATENT NO. 8,564,605**

58. The allegations set forth in the foregoing paragraphs 1 through 57 are incorporated into this Third Claim for Relief.

59. The inventions of the '605 patent resolve technical problems associated with fixed display-memory mappings in configurable display systems, including increased memory size and cost resulting from the use of dedicated display memory. For example, the inventions improve the operation of display systems by employing general-purpose memory, a memory-access controller, and transaction descriptors that associate non-contiguous source addresses in general-purpose memory with contiguous destination addresses identifying display drivers. These techniques allow display data to be stored at different, non-contiguous locations in general-purpose memory while ensuring that the appropriate data is delivered to the corresponding portions of a display panel, thereby reducing overall system cost and size while increasing configurability and versatility.

60. The claims of the '605 patent are directed to specific technological improvements in display-interface buffering and memory-access operations, rather than an abstract idea implemented using conventional computer components. In particular, the claims address problems arising in configurable display systems, including the inflexibility and increased memory requirements associated with dedicated display memories having fixed mappings between stored data and display-panel locations. The claimed transaction descriptors and memory-access operations provide a specific technological solution to these problems by enabling display data stored at non-contiguous memory locations to be retrieved and delivered to selected display drivers without requiring a dedicated display memory having a fixed mapping to the display panel.

61. The claims of the ’605 patent do not merely recite the routine or conventional use of memory to drive a display panel. Instead, the claims require particular combinations of general-purpose memory, transaction descriptors, and display-driver addressing operations that associate non-contiguous source addresses with contiguous destination addresses identifying selected display drivers. The claims further specify how the transaction descriptors identify the amount of data to be accessed and control the transfer of that data from general-purpose memory to the appropriate display drivers. Certain claims additionally require FIFO buffers, address decoders, drive-voltage selectors, and general-purpose I/O functionality that provide specific mechanisms for receiving, buffering, and presenting display data. These techniques improve memory utilization, facilitate efficient data transfers, and increase the flexibility of display-interface operations.

62. The technology claimed in the ’605 patent does not preempt all methods of accessing memory to drive a display panel, the use of all display buffers, display drivers, or memory-access controllers, or other known display-interface technologies. Instead, the claims are directed to particular combinations of display-interface buffering and memory-access operations involving transaction descriptors that associate non-contiguous source addresses in general-purpose memory with contiguous destination addresses identifying display drivers, together with data-size information governing the transfer of display data. Certain claims further specify particular FIFO-buffering arrangements, drive-voltage selection circuitry, address-decoding operations, or general-purpose I/O configurations that provide additional control over display-interface operation.

63. Accordingly, the claims of the ’605 patent recite specific technological features and combinations of elements directed to improving the operation of configurable display

systems, rather than merely claiming a desired result. These claimed features, individually and in their ordered combinations, provide concrete mechanisms for accessing display data stored at non-contiguous locations in general-purpose memory and delivering that data to selected display drivers, thereby improving memory utilization and display-system configurability. The claims therefore support the conclusion that they are directed to patent-eligible subject matter and recite significantly more than any alleged abstract idea.

64. Upon information and belief, Defendant has and continues to directly infringe at least claim 1 of the ’605 patent by making, using, selling, importing and/or providing and causing to be used semiconductor devices, including its R-Car E2 and R-Car E3 families of automotive systems-on-chip (collectively, the “’605 Accused Instrumentalities”). The ’605 Accused Instrumentalities are integrated semiconductor processors designed for automotive display and infotainment applications, including vehicle instrument clusters, display audio systems, and integrated cockpit systems. The ’605 Accused Instrumentalities incorporate memory-access controllers, graphics-processing circuitry, and display-output interfaces that facilitate the retrieval, processing, and presentation of display data on electronic display panels.

65. The ’605 Accused Instrumentalities include, without limitation, the R-Car E2 (including the R8A77940) and R-Car E3 (including the R8A77990). These devices include memory interfaces for accessing external system memory, circuitry for processing graphics and video data, and display controllers for providing display data to connected display panels. The R-Car E2 incorporates a DDR3 memory controller, graphics-processing circuitry, and two display-output channels. The R-Car E3 similarly incorporates DDR3L memory interfaces, graphics-processing circuitry, and display-output functionality for automotive instrument clusters and other display applications.

66. Exemplary infringement analysis showing infringement of claim 1 of the ’605 patent is set forth in Exhibit D-1 This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by Renesas with respect to the ’605 patent. EFT reserves all rights to amend, supplement and modify this preliminary infringement analysis. Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the ’605 patent.

67. On information and belief, these ’605 Accused Instrumentalities are sold, marketed, provided to, and/or used by or for Defendant’s partners, clients, customers and end users across the country and in this District.

68. Defendant was made aware of the ’605 patent and its infringement thereof at least as early as March 1, 2022 when it received correspondence from the prior owner of the ’605 patent identifying the ’605 patent and representative products covered by the ’605 patent .

69. Upon information and belief, since at least the time Defendant received notice, Defendant has induced and continues to induce others to infringe at least one claim of the ’605 patent under 35 U.S.C. § 271(b) by, among other things, and with specific intent or willful blindness, actively aiding and abetting others to infringe, including but not limited to Defendant’s partners, clients, customers, and end users, whose use of the ’605 Accused Instrumentalities constitutes direct infringement of at least one claim of the ’605 patent.

70. In particular, Defendant’s actions that aid and abet others such as its partners, customers, clients, and end users to infringe include advertising and distributing the ’605 Accused Instrumentalities and providing instruction materials, training, and services regarding the ’605 Accused Instrumentalities. On information and belief, Defendant has engaged in such actions with specific intent to cause infringement or with willful blindness to the resulting

infringement because Defendant has had actual knowledge of the ’605 patent and knowledge that its acts were inducing infringement of the ’605 patent since at least the date Defendant received notice that such activities infringed the ’605 patent.

71. Upon information and belief, Defendant is liable as a contributory infringer of the ’605 patent under 35 U.S.C. § 271(c) by offering to sell, selling and importing into the United States Renesas R-Car Products to be especially made or adapted for use in an infringement of the ’605 patent. The Accused Instrumentalities are a material component for use in practicing the ’605 patent and are specifically made and are not a staple article of commerce suitable for substantial non-infringing use.

72. Since March 1, 2022, Defendant’s infringement has been willful.

73. The ’605 Accused Instrumentalities infringed and continue to infringe claim 1 of the ’605 patent during the pendency of the ’605 patent

74. EFT has been harmed by the Defendant’s infringing activities.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, EFT demands a trial by jury on all issues triable as such.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff EFT demands judgment for itself and against Renesas as follows:

A. An adjudication that the Renesas has infringed the ’953, ’346, and ’605 patents;

B. An award of damages to be paid by Renesas adequate to compensate EFT for Renesas’s past infringement of the ’953 and ’346 patents, including interest, costs, expenses and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

C. An award of damages to be paid by Renesas adequate to compensate EFT for Renesas's past infringement of the'605 patent, and any continuing or future infringement through the date such judgment is entered, including interest, costs, expenses and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

D. A declaration that this case is exceptional under 35 U.S.C. § 285, and an award of EFT's reasonable attorneys' fees; and

E. An award to EFT of such further relief at law or in equity as the Court deems just and proper.

Dated: October 23, 2026

SHEA | BEATY | POET PLLC

*/s/ Trevor J. Beaty*

Trevor J. Beaty
beaty@sbp.law
One Grande Centre
1800 Teague Drive, Suite 500
Sherman, TX 75090
Tel: (903) 870-7771

*Attorneys for Plaintiff Elysian Fields Technologies LLC*